# 22-3128

## United States Court of Appeals
## for the Second Circuit

VARISCITE NY ONE, INC.,

*Plaintiff-Appellee,*

v.

STATE OF NEW YORK, NEW YORK STATE OFFICE OF CANNABIS MANAGEMENT,
CHRISTOPHER ALEXANDER,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the Northern District of New York

## BRIEF FOR APPELLANTS

LETITIA JAMES
  *Attorney General*
  *State of New York*

BARBARA D. UNDERWOOD
  *Solicitor General*
JEFFREY W. LANG
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
    *of Counsel*

Attorney for Defendants-Appellants
The Capitol
Albany, New York 12224
(518) 776-2042

Dated: March 23, 2023

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iii

PRELIMINARY STATEMENT ................................................................ 1

ISSUES PRESENTED ............................................................................ 3

STATEMENT OF THE CASE ................................................................ 4

    A.   New York's Cannabis Laws and Regulations .......................... 4

    B.   Plaintiff's Application ............................................................ 10

    C.   The District Court Grants a Preliminary Injunction and Declines to Narrow the Injunction ........................................ 12

STANDARD OF REVIEW...................................................................... 16

SUMMARY OF ARGUMENT ................................................................ 16

ARGUMENT ......................................................................................... 21

POINT I

PLAINTIFF FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS IN ITS CHALLENGES TO NEW YORK'S LICENSE REQUIREMENTS ...................... 21

    A.   Plaintiff Lacks Standing to Challenge New York's License Requirements, And to the Extent It Ever Had Such Standing, Its Challenges Are Now Moot ...................... 21

    B.   New York's License Requirements Do Not Violate the Dormant Commerce Clause.................................................... 33

POINT II

PLAINTIFF FAILED TO ESTABLISH THAT IT WOULD SUFFER IRREPARABLE INJURY ABSENT A STAY.................................................. 46

i

**Page**

POINT III

THE DISTRICT COURT ERRED IN APPLYING THE REMAINING
PRELIMINARY INJUNCTION FACTORS.....................................................48

POINT IV

AT A MINIMUM THE PRELIMINARY INJUNCTION SHOULD BE
NARROWED TO ONLY THE FINGER LAKES REGION................................52

CONCLUSION ........................................................................................56

# TABLE OF AUTHORITIES

CASES                                                          PAGE(S)

*Alexander v. Yale Univ.*,
631 F.2d 178 (2d Cir. 1980) ................................................................ 27

*Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*,
2023 WL 1798173 (W.D. Wash. Feb. 7, 2023) ................................... 34

*Brown & Williamson Tobacco Corp. v. Pataki*,
320 F.3d 200 (2d Cir. 2003) ................................................................ 28

*Cacchillo v. Insmed, Inc.*,
638 F.3d 401 (2d Cir. 2011) ................................................................ 22

*Civil Rights Cases*,
109 U.S. 3 (1883) ................................................................................... 28

*Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) .............................................................................. 30

*Clinton v. City of New York*,
524 U.S. 417 (1998) .............................................................................. 28

*Conn. Citizens Def. League, Inc. v. Lamont*,
6 F.4th 439 (2d Cir. 2021) ................................................................... 22

*Daniel v. Paul*,
395 U.S. 298 (1969) .............................................................................. 27

*Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*,
764 F.3d 210 (2d Cir. 2014) ................................................................ 16

*Jakievski v. Exec. Dir., Rochester Psychiatric Ctr.*,
955 F.3d 314 (2d Cir. 2020) ................................................................ 22

*Kamerling v. Massanari*,
295 F.3d 206 (2d Cir. 2002) ................................................................ 46

*Kane v. De Blasio*,
19 F.4th 152 (2d Cir. 2021) ................................................................. 52

iii

CASES                                                                              PAGE(S)

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992).................................................................. 30

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990).................................................................. 22

*Madsen v. Women's Health Ctr.*,
   512 U.S. 753 (1994).................................................................. 53

*Ne. Patients Grp. v. United Cannabis Patients & Caregivers*
   *of Me.*,
   45 F.4th 542 (1st Cir. 2022)....................................................... 34, 37

*Nicholson v. Scoppetta*,
   344 F.3d 154 (2d Cir. 2003) ....................................................... 16

*Northeastern Florida Chapter of Associated General*
   *Contractors of America v. City of Jacksonville*,
   508 U.S. 656 (1993).................................................................. 27

*NPG, LLC v. City of Portland*,
   2020 WL 4741913 (D. Me. Aug. 14, 2020)................................... 37

*Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*,
   511 U.S. 93 (1994).................................................................... 41

*Pike v. Bruce Church, Inc.*,
   397 U.S. 137 (1970).................................................................. 34, 38

*San Filippo v. United Bhd. of Carpenters & Joiners of Am.*,
   525 F.2d 508 (2d Cir. 1975) ....................................................... 15

*Shelton v. Liquor & Cannabis Bd.*,
   2022 WL 2651617 (W.D. Wash. July 8, 2022).............................. 34

*SM Kids, LLC v. Google LLC*,
   963 F.3d 206 (2d Cir. 2020) ....................................................... 21

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
   139 S. Ct. 2449 (2019).......................................................... passim

iv

| CASES | PAGE(S) |
|---|---|

*Town of Southold v. Town of E. Hampton*,
477 F.3d 38 (2d Cir. 2007) ......................................................... passim

*Trump v. Int'l Refugee Assistance Project*,
137 S. Ct. 2080 (2017)..................................................... 52, 53, 54, 55

*United States v. Smith*,
945 F.3d 729 (2d Cir. 2019) ............................................................ 23

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
549 F.3d 100 (2d Cir. 2008) ............................................................ 21

*We the Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021)............................................................. 48

*Winter v. NRDC, Inc.*,
555 U.S. 7 (2008)............................................................................ 16

**CONSTITUTIONAL PROVISIONS**

U.S. Const.
art. I, § 8, cl. 3 .......................................................................... 33

**STATE STATUTES**

N.Y. Cannabis Law
§ 2 ...................................................................................... 1, 4, 5, 41
§ 3 ........................................................................................... 5, 6, 23
§§ 7-11 ........................................................................................... 5
§§ 61-89 ...................................................................................... 5, 38

N.Y. State Finance Law
§ 99-ii........................................................................................ 9, 42

**STATE REGULATIONS**

9 N.Y.C.R.R.
§ 116.4 ................................................................................... passim
§§ 130.1-130.29 ............................................................................ 38

**RULES**                                                                 **PAGE(S)**

Fed. R. Civ. P. 52 (1985 am.)....................................................................15

**MISCELLANEOUS AUTHORITIES**

Brief for Illinois et al. as Amici Curiae, *Tenn. Wine & Spirits
  Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019), 2018
  WL 6168781 .......................................................................36

Brief of Nat'l Alcohol Beverage Control Ass'n et al. as Amici
  Curiae, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*,
  139 S. Ct. 2449, 2459 (2019), 2018 WL 6168787................................38

Cannabis Control Bd., Presentation (Mar. 6, 2023),
  https://cannabis.ny.gov/system/files/documents/2023/03/
  cannabis-control-board-presentation-3-2-2023.pd .............................9

Emma Tucker and Laura Ly, *New York Recreational
  Cannabis Sales Begin*, CNN (Dec. 29, 2022),
  https://www.cnn.com/2022/12/29/us/new-york-marijuana-
  first-legal-sales/index.html..................................................10

# PRELIMINARY STATEMENT

In 2021, New York passed the Marihuana Regulation and Taxation Act in response to findings that its existing laws criminalizing marihuana had "resulted in devastating collateral consequences including mass incarceration" and inhibited otherwise law-abiding individuals' "ability to access housing, employment opportunities, and other vital services." N.Y. Cannabis Law ("N.Y. Canbs.") § 2. In order to repair the harms resulting from New York's prior laws criminalizing marihuana, the Act legalizes adult cannabis use; licenses businesses to grow, manufacture, and sell cannabis in the State; and as is relevant here, specifies criteria for granting licenses for the sale of cannabis.

In particular, the law and its implementing regulations require applicant businesses to have a significant presence in New York, which can be satisfied in a variety of ways, including by incorporation under the laws of New York (the "significant-presence" requirement). And they require applicant businesses to be owned by individuals personally affected by the State's criminalization of marihuana, because either they or a close family member or caregiver has a marihuana conviction under New York law (the "justice-involved" requirement). The State invited

applications for a first round of 150 licenses for the sale of cannabis to businesses meeting these requirements.

Plaintiff Variscite NY One, Inc. is a business incorporated in New York and majority-owned by someone convicted under Michigan law of marihuana use. It argues that New York's license requirements unconstitutionally discriminate against out-of-state actors. The District Court for the Northern District of New York (Sharpe, J.) agreed, granting plaintiff a preliminary injunction prohibiting issuance of dispensary licenses in five out of 14 regions of the State.

This Court should reverse the district court's decision granting a preliminary injunction. In concluding that plaintiff was likely to succeed in its challenge to New York's laws, the district court ignored fatal deficiencies in the justiciability of plaintiff's suit that deprived the court of jurisdiction to grant a preliminary injunction. And on the merits, the court concluded, without explanation, that New York's requirements discriminate against out-of-state economic actors despite the fact that *none* of the challenged regulations discriminate against non-residents facially, or in purpose, or in effect. Contrary to the district court's

conclusion, all of New York's requirements comport with the dormant Commerce Clause.

What's more, the district court erred in determining that the remaining preliminary injunction factors—irreparable harm, balance of the equities, and public interest—weighed in plaintiff's favor. The district court overlooked defendants' evidence that plaintiff will suffer no irreparable injury absent a preliminary injunction and ignored unrebutted evidence that a preliminary injunction would cause ongoing substantial harm to other license applicants in the regions, who are thwarted from starting their new businesses despite the State's promise to help repair the harm they have suffered. The court also ignored evidence of harm to cannabis growers and processors, residents in the enjoined regions, and the State. These errors individually or taken together warrant reversal. At a minimum, the Court should narrow the preliminary injunction to enjoin issuing licenses in just the Finger Lakes, which is the only region in which plaintiff could receive a license.

## ISSUES PRESENTED

1.    Did plaintiff fail to demonstrate that its challenges to New York's licensing requirements are justiciable?

3

2.     Do New York's significant-presence requirement and justice-involved requirement for licenses to sell marihuana likely satisfy the requirements of the dormant Commerce Clause?

3.     Did plaintiff fail to demonstrate irreparable harm absent a preliminary injunction?

4.     Did the district court improperly discount evidence of injuries that a preliminary injunction would cause to license applicants, cannabis growers and processors, cannabis consumers, and the State?

5.     Did the district court err in refusing to narrow the preliminary injunction to the only region, the Finger Lakes, where plaintiff could even possibly be considered for a license?

## STATEMENT OF THE CASE

### A.   New York's Cannabis Laws and Regulations

In 2021, the New York Legislature concluded that the State's existing laws criminalizing marihuana use had "not been beneficial to the welfare of the general public." N.Y. Canbs. § 2. The Legislature explained that New York's marihuana criminalization and enforcement had "resulted in devastating collateral consequences including mass incarceration and other complex generational trauma, that inhibit an otherwise

4

law-abiding citizen's ability to access housing, employment opportunities, and other vital services." *Id.* To correct these effects, the Legislature enacted the State's Cannabis Law.

The Cannabis Law legalizes adult-use cannabis and regulates the production, manufacturing, distribution, and sale of cannabis within the State. N.Y. Canbs. §§ 3, 61-89. In particular, the law creates a system for licensing cultivators, processors, distributors, and retailers of adult-use cannabis, among other license types. *See id.* The Cannabis Law outlines the application process for cannabis licenses and the criteria to be used in selecting licensees. *Id.* §§ 3, 61-64. The Legislature requires that an applicant for a license demonstrate a significant connection to New York State, in one of three ways: "has a significant presence in New York state, either individually or by having a principal corporate location in the state; is incorporated or otherwise organized under the laws of this state; or a majority of the ownership are residents of this state." *Id.* § 3(1).

The Cannabis Law also establishes the Cannabis Control Board and Office of Cannabis Management (OCM), which are in charge of setting and enforcing standards for cannabis licensing, as well as the legal cannabis industry more generally within the State. *Id.* §§ 7-11.

5

To implement the Cannabis Law, OCM promulgated the Conditional Adult-Use Retail Dispensary (CAURD) regulations and issued an application form based on these regulations to be used to license the first 150 dispensaries for adult-use cannabis in New York. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 9, § 116.4; *see also* (JA 137, 146-63, 376.)

Under OCM's regulations, a for-profit business applying for a license was required to meet three threshold criteria. First, in a requirement mirroring Cannabis Law § 3(1), the applicant had to demonstrate a significant presence in New York (the "significant-presence requirement"). To satisfy this requirement, an applicant could have a principal corporate place of business in the State, be incorporated under State law, have a majority of its ownership reside in New York for at least half of the current year, or otherwise demonstrate a "significant presence." 9 N.Y.C.R.R. § 116.4(a)(1).[1] OCM subsequently issued a guidance document explaining that the phrase "significant presence" includes a

---

[1] Although the words "significant presence" only appear in 9 N.Y.C.R.R. § 116.4(a)(1)(i), the entirety of 9 N.Y.C.R.R. § 116.4(a)(1)'s disjunctive criteria is collectively referred to as the significant-presence requirement.

6

business's owner with sole control having "residency (live in), assets (vehicles, land, etc.), real property (this includes primary, secondary, and/or rental homes), a bank account, or some other connection with or in New York State." (JA 148.) And OCM encouraged any owners of a business that might apply for a license to contact the agency if they were unsure whether they satisfied the significant-presence requirement. (JA 148.)

Second, the applicant had to demonstrate prior adverse involvement with New York's criminal justice system (the "justice-involved requirement"). 9 N.Y.C.R.R. § 116.4(a)(2)(i). To satisfy this requirement, one or more individuals owning the business must have been convicted of a marihuana-related offense under New York law, or have a close family member or caregiver convicted of such an offense, prior to March 31, 2021. *Id.* As part of this requirement, the applicant had to submit with its application "evidence of the primary residence of the justice involved individual at the time of such individual's arrest or conviction." *Id.* § 116.4(a)(2)(ii). This provision (the "address provision") would be used to determine whether the affected individual had lived in an area with a "historically low median income" at the time of arrest or

7

conviction, which OCM determined would be one of the criteria by which applicants would be evaluated. *Id.* § 116.4(c)(2)(ii); (JA 137-39, 380-81).

Third, the applicant had to demonstrate that one or more of its owners had a certain amount of relevant prior experience running a business. *Id.* § 116.4(a)(2)(iii).

Consistent with these regulations, OCM established the method by which it would assess applicants to determine which businesses received the limited number of available licenses. Applicants would be scored based on several factors: (1) the average household income of the census tract where the convicted individual lived at the time of their arrest as compared with other census tracts within the relevant county or region, with lower-income areas receiving a higher score (accounting for 40% of applicant's total score), (2) whether the owner of the applying business was the individual convicted or was a relative of the individual convicted (15% of the applicant's total score), and (3) the nature of the qualifying business, including the owners' previous experience operating a business with physical locations, whether the business had been denied a bank loan, whether the business had uncleared tax liens, and the business's overall capacity (altogether accounting for the final 45% of the applicant's

total score). (JA 380-82); *see also* 9 N.Y.C.R.R. § 116.4(c). Applicants could be awarded up to 100 points total. (*See* JA 382, 386-88.)

OCM divided the state into 14 geographic regions, each with a specified number of licenses available. (*See* JA 161.) Each applicant was asked to indicate its top five preferred regions. OCM would consider assigning an applicant to a region other than its top choice only if there were insufficient applications for one of the applicant's lower-ranked regions. (JA 375.) Otherwise, each applicant would be compared to the other applicants seeking a license in only its top-ranked region, with the highest-scoring applicants receiving the available licenses.[2]

To aid license recipients in the creation and maintenance of their businesses, the New York Legislature appropriated $50 million for OCM to help CAURD license recipients fund the capital costs associated with establishing a dispensary. N.Y. State Fin. Law § 99-ii(3)(d). This money was intended to reduce the barriers for individuals, particularly

---

[2] New York's Cannabis Control Board has subsequently announced its intention to double the number of available CAURD licenses to 300, with each region receiving double the number of licenses initially available. Cannabis Control Bd., Presentation at 9 (Mar. 6, 2023), https://cannabis.ny.gov/system/files/documents/2023/03/cannabis-control-board-presentation-3-2-2023.pdf.

individuals with marihuana convictions, to become business owners and operators, and thereby make it more likely that their businesses would succeed. (JA 131-32); *see also* Emma Tucker and Laura Ly, *New York Recreational Cannabis Sales Begin*, CNN (Dec. 29, 2022)[3] (recognizing that attempts in other states to "create paths into the [cannabis] industry for those with non-violent marijuana convictions" had been largely unsuccessful due to states' failures to "offer financial and business resources" to these potential business owners).

### B. Plaintiff's Application

OCM accepted applications from August 25 through September 26, 2022. (*See* JA 139.) It ultimately received 903 applications for the 150 licenses available. (JA 376.)

Plaintiff applied for a license. (JA 178-98.) According to its application, Kenneth Gay, a Michigan resident, owns 51% of Variscite and Jeffrey Jensen, a California resident, owns 49%. (JA 179-80.) Plaintiff is incorporated under the Business Corporation Law of the State of New

---

[3]  https://www.cnn.com/2022/12/29/us/new-york-marijuana-first-legal-sales/index.html.

York. (JA 11, 140.) According to the application, owner Kenneth Gay is justice-involved, with a 2007 conviction for Criminal Possession of Marihuana in the First Degree. (JA 182.) Gay's marihuana conviction was under Michigan law rather than New York law, however. (JA 17.) Plaintiff selected the Finger Lakes region as its top choice, with Central New York, Western New York, Mid-Hudson, and Brooklyn as its second through fifth choices respectively. (JA 188.)

Although plaintiff did not satisfy the justice-involved requirement for a license, OCM processed plaintiff's application as though that criterion was satisfied both for purposes of responding to this lawsuit and because plaintiff had erroneously checked off the box indicating that one of its owners had a New York conviction. (JA 379-80.) OCM thus scored the application as though the requirement had been met and ultimately awarded plaintiff 41 points out of a possible 100. (JA 382, 386.) This score was lower than 40 license applicants for licenses in the Finger Lakes region—in which only nine CAURD licenses are currently available, doubling to 18 licenses under OCM's proposed expansion (*see supra* p. 9 n.2)—and OCM prepared a rejection letter for plaintiff based on its low score rather than its failure to satisfy the justice-involved requirement.

(JA 379-82, 386); *see also* Defs' Reply in Support of Motion to Dismiss at 4 n.2, *Variscite NY One, Inc. v. State of New York*, No. 22-cv-01013 (N.D.N.Y. Nov. 30, 2022), ECF No. 32 (discussing rejection letter). OCM has not yet sent that rejection letter due to this ongoing litigation.

## C. The District Court Grants a Preliminary Injunction and Declines to Narrow the Injunction

Plaintiff filed the present suit seeking injunctive and declaratory relief on September 26, 2022—the final date to apply for a CAURD license to sell cannabis. (*See* JA 11-21.) It challenged New York's significant-presence requirement and justice-involved requirement, arguing that they violate the dormant Commerce Clause. (JA 18-19.) It also challenged the address provision related to the justice-involved requirement, alleging that, contrary to OCM's regulations, OCM would use the address at which a justice-involved person lived when arrested or convicted to "score an applicant higher if the individual's residence at the time of the individual's arrest or conviction was in New York," and requesting as relief that OCM not be allowed to use these addresses "in a manner that favors New York residences over out-of-state residences." (JA 13-14, 20.)

Following a hearing, on November 10, 2022, the district court (Sharpe, J.) granted plaintiff's motion for a preliminary injunction in the five geographic regions for which plaintiff had indicated a preference. The court acknowledged that plaintiff "would qualify as having a significant New York State presence" under New York's regulations, but the court seemingly concluded that a line on the CAURD application website set a different requirement for significant presence that plaintiff did not meet. (SA 9 n.3.) It then concluded that plaintiff was likely to succeed on the merits of its challenge, holding without explanation that the challenged requirements discriminated against out-of-state economic actors, that the regulations were subject to heightened dormant Commerce Clause scrutiny, and that they were not narrowly tailored to advance a legitimate local purpose. (SA 18-23.)

The court further concluded that plaintiff had shown a risk of irreparable harm because any infringement on constitutional rights "automatically qualifies as irreparable harm." (SA 23-25.) And it determined that the balance of hardships favored plaintiff because OCM had not yet begun issuing dispensary licenses and because the injunction would apply only to five regions. (SA 27-28.) Finally, the court concluded

13

that the public interest would be served by an injunction because uncon-
stitutional policies are always contrary to the public interest. (SA 28.) In
its decision, the district court did not reference almost any of the evidence
proffered by defendants on any of the preliminary injunction factors, nor
did the court explain why plaintiff had met its burden of persuasion.

Defendants appealed (JA 389) and moved in the district court to
narrow the preliminary injunction to a single region and for a stay
pending appeal. The motion was based on newly discovered information
showing that plaintiff would only be considered for a license in its top-
choice geographic region and on the manifest injustice that would occur
if the preliminary injunction continued in the other four enjoined regions.
(JA 372.) OCM explained that, after reviewing all 903 applications for
licenses, it had determined that there were a sufficient number of quali-
fying applications for each geographic region, resulting in every applicant
being considered only for its top-choice region. (JA 376.) And OCM
further explained that it could not have provided this information to the
district court in its opposition to plaintiff's motion for a preliminary
injunction given the time-consuming manual review and scoring of each
application. (JA 446-47.)

14

The district court denied defendants' motions.[4] (SA 30-49.) The court concluded that defendants had provided no basis to reconsider the scope of the injunction because OCM should have known on September 26, 2022, that it had enough applicants for each geographic region. (SA 45.) The district court also saw no manifest injustice in declining to narrow the injunction even though in its current form the injunction prevented OCM from issuing licenses in four geographic regions in which plaintiff would not be considered for a license under any circumstance. (SA 46.)

Defendants timely filed an amended notice of appeal including the district court's order denying the motion to narrow the preliminary injunction as well as the earlier order granting the injunction. (JA 458.)

_____

[4] The district court simultaneously denied defendants' separate motion to dismiss. That motion is not currently before this Court, although this Court may in its discretion review the district court's denial of defendants' motion to dismiss as raising the same issues of subject-matter jurisdiction at issue in the orders appealed. *San Filippo v. United Bhd. of Carpenters & Joiners of Am.*, 525 F.2d 508, 512-13 (2d Cir. 1975), *separate holding superseded by* Fed. R. Civ. P. 52 (1985 am.).

15

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). The party seeking a preliminary injunction bears the burden of demonstrating that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Id.* at 20.

On appeal from an order granting preliminary injunctive relief, this Court reviews the district court's legal holdings de novo and its ultimate decision for abuse of discretion. *Goldman, Sachs & Co. v. Golden Empire Sch. Fin. Auth.*, 764 F.3d 210, 214 (2d Cir. 2014). An abuse of discretion "usually consists of clearly erroneous findings of fact or the application of an incorrect legal standard." *Nicholson v. Scoppetta*, 344 F.3d 154, 165 (2d Cir. 2003) (citation omitted).

## SUMMARY OF ARGUMENT

The district court erred in preliminarily enjoining OCM from issuing CAURD dispensary licenses in five regions of the State, for several independent reasons.

16

1.     Plaintiff failed to demonstrate a likelihood of success because its claims are not justiciable. Plaintiff does not have standing to challenge New York's significant-presence requirement because plaintiff satisfies that requirement by being incorporated under the law of New York. That is all that significant-presence requires.

Plaintiff also lacks standing to challenge the justice-involved requirement, because defendants have demonstrated that OCM will deny plaintiff's license application for reasons unrelated to this requirement— namely, plaintiff scored too low on OCM's objective assessment rubric. And to the extent that plaintiff's suit seeks only an opportunity to be considered for a license on equal terms as an applicant that satisfies the justice-involved requirement, OCM has already provided that opportunity, and plaintiff's claim is now moot.

Finally, plaintiff lacks standing to challenge the address provision because it has not demonstrated an injury that is actually imminent, instead relying on an unfounded, and indeed disproven, assertion that OCM will use information obtained under that provision in a manner that is not authorized by state law and would violate the constitution. And, because defendants' evidence demonstrates that OCM has only used

17

the provision in a lawful and constitutional manner, plaintiff's claim is also moot.

2. Plaintiff further failed to demonstrate a likelihood of success because all of the challenged provisions satisfy the dormant Commerce Clause.

The significant-presence requirement does not discriminate against out-of-state economic actors. Rather than require an applicant's owner to reside in the state, the provision provides a host of ways for an applicant to demonstrate "presence" not tied to residency. And the requirement is necessary to ensure that a business selling cannabis within New York is subject to the laws of the State, that the business can be sued in the State's courts, and that regulators can collect on any fines imposed. The requirement thus satisfies either the permissive *Pike* balancing test applicable to laws that incidentally burden interstate commerce or the heightened standard applicable to laws that discriminate against out-of-state actors.

The justice-involved requirement also does not discriminate against out-of-state economic actors. This provision treats all individuals with a marihuana conviction under New York law the same, whether they live

in New York or elsewhere. And many people living outside New York nevertheless have marihuana convictions under New York law. The provision exists to ameliorate the harm caused by New York's prior marihuana criminalization by ensuring that the benefits of New York's nascent cannabis industry flow primarily to individuals who were harmed by New York's prior criminal laws and their enforcement. Under the *Pike* balancing test, the local benefit of the provision is not clearly outweighed by any incidental burden on interstate commerce. And under a heightened standard, the requirement is narrowly tailored to provide lasting benefits to those exposed to lasting harm from marihuana criminalization.

The address provision does not implicate the dormant Commerce Clause either on its face or in practice. The provision requires evidence of an individual's address at the time they were arrested or convicted of a New York marihuana offense, which does not discriminate against out-of-state residents. And defendants' uncontroverted evidence demonstrates that OCM has used individuals' addresses in a manner that does not discriminate against out-of-state residents. Rather, these addresses have been used only to determine whether individuals lived in a

19

historically low-income area—whether in New York State or elsewhere—at the time of arrest or conviction by comparing the median household income of the address's census tract to the median household income of other census tracts in the surrounding area.

3. Plaintiff did not demonstrate that it was likely to suffer irreparable injury absent a preliminary injunction. Defendants' evidence conclusively demonstrated that OCM will reject plaintiff's license application even if the challenged provisions are enjoined, and plaintiff thus could not demonstrate that an injunction would prevent any injury whatsoever. In addition, because plaintiff is unlikely to succeed on the merits of its constitutional challenge, the district court's conclusion that plaintiff had demonstrated likely per se injury was erroneous.

4. The district court misapplied the remaining preliminary injunction factors by disregarding defendants' proffered evidence of the extensive, ongoing injuries that a preliminary injunction would cause to CAURD applicants, cannabis growers and processors in New York, members of the public interested in procuring cannabis products in the enjoined regions, and the State itself. These injuries outweighed any

putative injury to plaintiff, and thus the remaining factors weigh decidedly in defendants' favor.

5.    At a minimum, this Court should narrow the preliminary injunction to the Finger Lakes region because plaintiff is not eligible for a license in any of the other four enjoined regions.

## ARGUMENT

## POINT I

### PLAINTIFF FAILED TO ESTABLISH A LIKELIHOOD OF SUCCESS IN ITS CHALLENGES TO NEW YORK'S LICENSE REQUIREMENTS

**A.    Plaintiff Lacks Standing to Challenge New York's License Requirements, And to the Extent It Ever Had Such Standing, Its Challenges Are Now Moot**

To have standing, a plaintiff must demonstrate (1) an injury-in-fact, which is "concrete and particularized" harm that is actual or imminent, (2) a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant, and (3) a non-speculative likelihood that the injury can be remedied by the requested relief. *W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106-07 (2d Cir. 2008). A federal court lacks jurisdiction to consider an action in which the plaintiff cannot demonstrate standing. *See SM Kids, LLC v. Google LLC*,

963 F.3d 206, 210 (2d Cir. 2020). On a preliminary injunction, plaintiff's burden to demonstrate standing is "no less than that required on a motion for summary judgment," and plaintiff must demonstrate standing by specific evidence rather than resting on mere allegations. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 907 n.8 (1990)).

While standing focuses on whether the party invoking jurisdiction had the requisite stake in the outcome when suit was filed, the mootness doctrine ensures that the litigant's interest continues throughout the lawsuit. *Conn. Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 444 (2d Cir. 2021). A case becomes moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* (quoting *Jakievski v. Exec. Dir., Rochester Psychiatric Ctr.*, 955 F.3d 314, 319 (2d Cir. 2020)). Mootness is jurisdictional, and if a case no longer presents an actual, redressable injury, it must be dismissed. *Id.*

Here, plaintiff failed to meet its burden of demonstrating by specific evidence that it had a justiciable claim as to the challenged provisions. To the contrary, defendants' uncontroverted evidence proffered to the district court demonstrates that plaintiff has no injury that is fairly

22

traceable to any of New York's regulations, and in any event, plaintiff has already received the relief it requests.

### 1. Significant-presence requirement

Plaintiff lacks standing to challenge the significant presence requirement because, having satisfied that requirement, plaintiff has no injury traceable to it. As its complaint (JA 11) and application documents (JA 134, 140, 379) demonstrate, plaintiff is incorporated under the laws of the State of New York. Incorporation under New York law is sufficient by itself to establish significant presence in the State. N.Y. Canbs. § 3(1); 9 N.Y.C.R.R. § 116.4(a)(1)(ii). Plaintiff thus was not and could not be denied a license under this requirement and cannot challenge its constitutionality. *See United States v. Smith*, 945 F.3d 729, 739 (2d Cir. 2019) (plaintiff lacks standing to challenge statutory subsections "unrelated to the proscription of his conduct").

The district court concluded that plaintiff had standing to challenge the requirement based on a single line in the CAURD application website, which in the court's view, created a different requirement—that Variscite's owners have a "significant presence" in New York—that plaintiff did not satisfy. (SA 9 n.3.) But even if the application created such a

23

requirement, which it did not, plaintiff's alleged injury would be traceable only to the application. Plaintiff would still lack standing to challenge the *underlying statute and regulation*, which plaintiff plainly satisfies. And because this suit seeks injunctive and declaratory relief as to the statute and regulation themselves rather than OCM's application website, plaintiff lacks standing to pursue the present suit and is not entitled to an attendant preliminary injunction.

In any event, the license application created no additional requirement. The document on which the court relied merely restates *that* applicants must have significant presence in New York, not *how* an applicant can satisfy the requirement. OCM considers any applicant that satisfies one of 9 N.Y.C.R.R. § 116.4(a)(1)'s disjunctive criteria to have a significant presence in the State and has evaluated applications accordingly. Indeed, OCM has counseled that an individual may satisfy the "significant-presence" requirement through a non-exhaustive list of methods, including "some other connection with or in New York State" (JA 133, 148), and accordingly has treated an entity's incorporation under New York law as constituting significant presence for both the business *and its owners*. For that reason, OCM's Director of Operations

24

has repeatedly affirmed in declarations that plaintiff satisfies the significant-presence requirement under OCM's policy because plaintiff is incorporated under New York law. (JA 133-34, 379.) OCM has granted a license to at least one applicant that is likewise incorporated in New York but owned by a non-resident. The uncontroverted evidence that OCM actually accepted plaintiff's application as satisfying the significant-presence requirement is dispositive as to standing, particularly given that plaintiff has offered only unsupported speculation about how OCM *might have* interpreted a line in its application website.

Plaintiff thus lacks standing to challenge the significant-presence requirement, and the district court erred in granting plaintiff a preliminary injunction regarding this requirement.

### 2. Justice-involved requirement

Plaintiff likewise lacks standing to challenge the justice-involved requirement, and plaintiff's challenge is also moot. Plaintiff lacks standing because it cannot show any injury traceable to the justice-involved requirement: OCM reviewed plaintiff's application and concluded that even if plaintiff had demonstrated justice-involvement, plaintiff's score was not high enough to earn a license. Plaintiff thus

25

failed to qualify for a license for reasons unrelated to the challenged requirement.

Applying OCM's objective scoring criteria, plaintiff scored only 41 out of a possible 100 points, which is too low to qualify for a license in plaintiff's preferred location given the better scores of other applicants.[5] (JA 382, 386.) This low score was largely due to the business's justice-involved individual living in a high-income area at the time of his arrest. (JA 382, 387, 449-50.) Plaintiff also lost points for the nature of its business because the business had never sold products out of a storefront location, had no employees, and had not previously suffered financial obstacles such as denial of a bank loan.[6] (JA 382, 387.) Thus, even absent

---

[5] OCM's decision to expand the number of available CAURD licenses, *see supra* p. 9 n.2, does not alter this result. Under this expansion, there will be 18 licenses available in the Finger Lakes (i.e., double the 9 original). Plaintiff was ranked 41 out of the 43 total Finger Lake applicants and thus still does not score highly enough to qualify for a license.

[6] On November 28, 2022, Plaintiff amended its CAURD application, claiming that it had been denied a bank loan and had operated a personal services business. Those changes would boost its score by 6.75 points (yielding a total score of 47.75 out of 100) but would not materially improve Plaintiff's standing compared to other applicants for the Finger Lakes region. Plaintiff would be ranked 38 out of 43 applicants, rather than 41 out of 43.

26

the challenged requirement, plaintiff would not receive a license and cannot demonstrate an injury fairly traceable to the justice-involved requirement nor one that can be redressed by this Court. *See Alexander v. Yale Univ.*, 631 F.2d 178, 184 (2d Cir. 1980).

The district court nevertheless concluded that plaintiff had standing because, in the court's view, plaintiff's injury stemmed not from its lack of license, but rather its inability to compete on an equal footing with state residents. (SA 38-39.) The court incorrectly relied on the Supreme Court's decision in *Northeastern Florida Chapter of Associated General Contractors of America v. City of Jacksonville*, 508 U.S. 656 (1993), to support its conclusion. (SA 39.) But that case considered a violation of the Equal Protection Clause and recognized that in such cases, the very act of erecting barriers based on invidious discrimination, such as race-based exclusions, is itself a constitutional injury. 508 U.S. at 666; *see also Daniel v. Paul*, 395 U.S. 298, 307-08 (1969) (recognizing that a central purpose of antidiscrimination laws is to eliminate "the daily affront and humiliation" of race-based discrimination (citation omitted)).

No similar reasoning applies to dormant Commerce Clause challenges. Neither this Court nor any other has suggested that the protectionism forbidden by the dormant Commerce Clause is an affront to dignity akin to the "badges of slavery" that race-based discrimination—or discrimination against an individual based on another immutable characteristic—entails. *See Civil Rights Cases*, 109 U.S. 3, 21 (1883). Rather, as this Court has recognized, the purpose of the dormant Commerce Clause is purely economic. Specifically, the "fundamental objective of the dormant Commerce Clause is to preserve a national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 208 (2d Cir. 2003) (cleaned up) (citation omitted). Thus where, as here, plaintiff cannot demonstrate that State law has *actually impeded* its ability to compete in a local market, plaintiff lacks standing to challenge the law. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 457 (1998) (Scalia, J., concurring in part and dissenting in part) ("I know of no case outside the equal protection field in which the mere detriment to one's 'bargaining

position,' as opposed to a demonstrated loss of some bargain, has been held to confer standing.").

In any event, to the extent plaintiff's suit seeks an opportunity to compete for a license on equal footing, its claim is moot. As a factual matter, OCM credited plaintiff as having demonstrated the requisite justice-involvement, and even gave plaintiff the maximum score on this category received by those whose owner (and not family member) is the person with the New York marihuana conviction. OCM then assessed plaintiff's application, which received fewer points than applicants who would be entitled to the limited number of licenses available to the Finger Lakes region. (JA 379-80, 382, 449-52.) OCM assessed plaintiff's application using objective, preset criteria based on verifiable information, and it did so in the same manner as it assessed other applicants, including in the non-enjoined regions where OCM has granted licenses using this evaluation method. (JA 379-82, 452-53.)

By fully evaluating plaintiff's application despite its failure to satisfy the justice-involved requirement, OCM has already accorded plaintiff the opportunity that it seeks. There is no further relief to which plaintiff could be entitled if it were successful in this suit. Its claim is

thus moot. And to the extent plaintiff alleges injury in the form of not being granted a license, that injury is unrelated to the challenged requirements and cannot be redressed by this Court.

### 3.  Address provision

Finally, plaintiff's challenge to the address provision found in 9 N.Y.C.R.R. § 116.4(a)(2)(ii) fails because plaintiff lacks standing, and its challenge is moot.

First, plaintiff lacks standing because it cannot demonstrate that its alleged injury from the address provision is actual or imminent. To demonstrate an injury-in-fact, a plaintiff must show that "the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 565 n.2 (1992)). Here, plaintiff cannot trace any non-speculative injury to the provision, which requires only that applicants provide evidence of the address at which an individual convicted of a New York marihuana offense lived at the time of their arrest or conviction.

Plaintiff has never argued that the provision itself is unconstitutional on its face, only that plaintiff feared the provision would be

30

applied in a discriminatory manner. (*See* JA 13-14 (expressing a "belief" that OCM would use information gathered from the address provision to award more points to addresses in New York than addresses outside New York).) And plaintiff produced no evidence before the district court demonstrating a realistic probability that OCM would use address information to discriminate against out-of-state applicants. Nor could OCM do so consistent with its own regulations. These regulations circumscribe how an applicant's address may be used, and none of the permissible uses includes discriminating against applicants who reside out of state. *See* 9 N.Y.C.R.R. § 116.4(c)(2) (permitting the address to be used to determine whether the convicted individual lived in a high-crime area, a historically low-income area, or public housing).[7] And defendants provided sworn declarations from OCM that it was using this information only in a non-discriminatory way: by comparing the median household

_____

[7] While 9 N.Y.C.R.R. § 116.4(c)(2)(iii) provides that the address may be used to determine whether an applicant lived in public housing "in New York State or New York City," OCM has nevertheless interpreted this provision to apply to *any* public housing in any state. Regardless, this provision is not implicated in the present suit because plaintiff does not claim that Kenneth Gay lived in public housing in Michigan at the time of his arrest and conviction, and OCM thus had no occasion to apply the public-housing provision to Variscite's application.

income of the individual's address's census tract to the median household income of the census tracts in the surrounding county or region. (JA 137-39, 380-81, 449-52.) Given this evidence, plaintiff failed to demonstrate that its alleged injury from the address provision was certainly impending rather than merely speculative, and thus plaintiff failed to demonstrate standing to challenge the address provision.

Additionally and alternatively, plaintiff's challenge to the address provision is moot because plaintiff has already received all of the relief it requested regarding this provision. In its complaint, plaintiff requests that the district court prevent OCM from using an individual's address at the time of arrest or conviction "in a manner that favors New York residences over out-of-state residences." (JA 20.) But as defendants' uncontroverted evidence demonstrates, OCM has already evaluated plaintiff's application, has done so in a manner consistent with its regulations, and has used Kenneth Gay's address only in a way that treats him equally with New York residents. (JA 137-39, 380-81, 449-52.) In other words, defendants have already provided plaintiff with the complete relief it seeks, and there is no further relief for a court to order.

**B.    New York's License Requirements Do Not Violate the Dormant Commerce Clause**

Aside from these fatal defects of justiciability, plaintiff failed to demonstrate a likelihood of success on the merits of its case because New York's laws are constitutional. The Commerce Clause of the U.S. Constitution provides Congress with the power to regulate commerce "among the several States." U.S. Const. art. I, § 8, cl. 3. The Clause contains a "negative aspect" that "prevents the States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2459 (2019).

If a state law clearly discriminates against out-of-state goods or economic actors, the law can be sustained only on a showing that it is narrowly tailored to advance a legitimate local purpose. *Id.* at 2461. A law may be "clearly discriminatory" against out-of-state economic actors in three ways: (1) by discriminating against interstate commerce on its face, (2) by having a discriminatory purpose, or (3) by discriminating in effect. *Town of Southold v. Town of E. Hampton*, 477 F.3d 38, 48 (2d Cir. 2007). However, if a law only "incidentally burdens interstate commerce," it is subject to a permissive balancing test "and will be struck down if the

33

burden imposed on interstate commerce clearly exceeds the putative local gains." *Id.* at 47; *see also Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

As an initial matter, it is not clear that the dormant Commerce Clause applies at all, or that this Court or the district court are authorized to grant plaintiff relief, because distribution of marihuana remains illegal at the federal level, and there is thus no lawful national market or interstate commerce related to cannabis products. *See Brinkmeyer v. Wash. State Liquor & Cannabis Bd.*, 2023 WL 1798173, at *10-*11 (W.D. Wash. Feb. 7, 2023) (concluding that the dormant Commerce Clause is inapplicable because there is no national market for marihuana); *Shelton v. Liquor & Cannabis Bd.*, 2022 WL 2651617, at *5 (W.D. Wash. July 8, 2022) (declining to issue declaratory relief because a federal court "cannot order activity that remains federally illegal"). *But see Ne. Patients Grp. v. United Cannabis Patients & Caregivers of Me.*, 45 F.4th 542, 547-48 (1st Cir. 2022) (concluding that an illicit interstate market for marihuana exists and warrants application of the dormant Commerce Clause).

But even if the dormant Commerce Clause applies in this case, all three of the provisions challenged by plaintiff comport with the Clause. None discriminates against out-of-state actors on its face, in purpose, or in effect. At most, these provisions impose only incidental burdens on interstate commerce that are outweighed by local gains. But even if New York's requirements were subjected to the heightened standard of narrow tailoring, they would pass.

### 1. Significant-presence requirement

New York's significant-presence requirement does not discriminate on its face, in purpose, or in effect against out-of-state economic actors. Rather, the requirement promotes crucial state interests while providing a flexible set of methods by which applicants may subject themselves to State oversight.

In *Thomas*, the Supreme Court held that a two-year durational residency requirement to receive an alcohol retailers license plainly favored state residents over nonresidents, was not narrowly tailored to achieve a legitimate local purpose, and thus violated the dormant Commerce Clause. 139 S. Ct. at 2462, 2474-76. In so concluding, the Court recognized several legitimate, non-protectionist objectives the

requirement was intended to promote— including subjecting the licensee to process in the licensing state's courts and promoting responsible alcohol sales—but concluded that the licensing state either had not demonstrated that the residency requirement would further these goals or the state plainly had alternative means for achieving such goals. *Id.* at 2475-76; *see also* Brief for Illinois et al. as Amici Curiae at 14-22, *Thomas*, 139 S. Ct. 2449, 2018 WL 6168781 (discussing state interests).

New York heeded the Supreme Court's reasoning in *Thomas* when it created a regulatory system for cannabis. Rather than set a residency requirement for retailers, New York provided a flexible set of alternatives by which a potential retailer could subject itself to sufficient State oversight. Thus, the significant-presence requirement allows an applicant to satisfy the requirement through residency in the State *or* organizing under the laws of the State *or* having a principal place of business in the State *or* one of the owners having tangible assets, real property, or a bank account within the State *or* "some other connection with or in New York State." 9 N.Y.C.R.R. § 116.4(a)(1); (JA 148). A business owner outside of New York can satisfy the significant-presence requirement in a number of ways on equal terms with a state resident.

36

Accordingly, the significant-presence requirement does not discriminate against out-of-state economic actors on its face or in effect.

The cases on which the district court relied to conclude otherwise are inapt. (*See* SA 17-18.) All of those cases involved facially discriminatory regulations that gave preference to businesses owned by state residents or outright required in-state residency. *See, e.g.*, *Ne. Patients Grp. v. Utd. Cannabis Patients & Caregivers*, 45 F.4th 542, 544, 546 (1st Cir. 2022) (requirement that all officers of dispensary be state residents); *NPG, LLC v. City of Portland*, 2020 WL 4741913, at \*2 (D. Me. Aug. 14, 2020) (preference given to businesses majority-owned by individuals residing in state for at least five years). But the significant-presence requirement does not mandate residency at all.

Nor does the significant-presence requirement discriminate in purpose. The purpose of the significant-presence requirement is not protectionist, but rather to ensure that the State can oversee and regulate cannabis retailers. The significant-presence requirement ensures that any license applicant have sufficient ties to the State to be subject to enforcement proceedings in New York courts and that the State can collect any fines levied against a noncompliant entity through *in rem*

37

proceedings. *See Thomas*, 139 S. Ct. at 2474-76; Brief of Nat'l Alcohol Beverage Control Ass'n et al. as Amici Curiae at 17-19, *Thomas*, 139 S. Ct. 2449, 2018 WL 6168787 (discussing need for *in rem* proceedings in regulatory enforcement); *see also* (SA 134 (discussing purposes of significant-presence requirement)).

Because the significant-presence requirement does not discriminate against out-of-state economic actors, it is at most an incidental burden on interstate commerce subject to the permissive balancing test established in *Pike v. Bruce Church*. *See* 397 U.S. at 142. New York's law easily passes that test because any incidental burden on interstate commerce from the significant-presence requirement does not "clearly exceed[]" its local benefits. *Town of Southold*, 477 F.3d at 47. As explained above, the significant-presence requirement is a crucial enforcement mechanism to ensure that cannabis retailers follow laws and regulations, including those that regulate the source of cannabis products and ensure the safety of products sold, require tracking and record keeping of cannabis products, and set standards for lab testing of cannabis products. *See, e.g.*, N.Y. Canbs. § 78; 9 N.Y.C.R.R. §§ 130.1-130.29. And the burden on interstate commerce is marginal or

nonexistent. To qualify, an out-of-state resident need only, for example, incorporate a business under New York law, open a bank account in New York, or move some existing assets to a location within the State. Indeed, plaintiff was successfully incorporated under New York law despite being owned by two non-residents. (JA 148, 172.)

And even if the significant-presence requirement was subjected to the more heightened standard applied to laws that discriminate against out-of-state economic actors, the requirement would be constitutional. The significant-presence requirement is narrowly tailored to advance legitimate local purposes. *See Thomas*, 139 S. Ct. at 2461. The law is written and enforced in a permissive manner to allow maximum flexibility in how applicants may satisfy the requirement. Indeed, OCM has expressly left open that unspecified "connections" with New York will satisfy the requirement so long as the connection allows OCM to fulfill its regulatory obligations. (*See* JA 148, 172.) It is unsurprising, then, that *no* applicant for a CAURD license has been disqualified under the significant-presence requirement.

Regardless of the standard applied, the significant-presence requirement satisfies the dormant Commerce Clause.

## 2.   Justice-involved requirement

The justice-involved requirement likewise satisfies the dormant Commerce Clause. First, the justice-involved requirement does not discriminate against out-of-state economic actors either on its face or in effect. Namely, it does not require that anyone associated with an applicant be a resident of New York, only that an owner or their relative have a marihuana conviction under New York law. An individual need not be a current resident of New York to have a marihuana-related conviction under State law. Individuals may have been convicted of a New York marihuana-related offense while previously living in the State, attending college there, commuting to New York for work, visiting New York on vacation, or passing through one of New York's international airports or other transit facilities where people and bags are subjected to drug searches. And the justice-involved requirement also awards points to business owners whose *family members* have a marihuana conviction under New York law. In other words, a business may be owned by an individual who has never been to New York if that person's spouse, parent, or child was convicted of a marihuana-related offense under New York law.

40

To be sure, many individuals who have marihuana-related offenses under New York law will be current State residents. But the requirement does not discriminate because it does not apply "differential treatment" to "in-state and out-of-state economic interests that benefit the former." *Town of Southold*, 477 F.3d at 47 (quoting *Or. Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994)). Rather, the justice-involved requirement at most places an incidental burden on interstate commerce. *See id.* at 49-50 (concluding that law prohibiting ferries from landing in town only incidentally burdened interstate commerce).

Second, the justice-involved requirement does not have a discriminatory purpose. Rather, New York's purpose in requiring justice-involvement is to ameliorate the harm done by New York's prior laws criminalizing marihuana, including their selective enforcement and the collateral consequences such as incarceration and lack of employment opportunities caused by a criminal marihuana conviction. N.Y. Canbs. § 2. New York thus gave preference to individuals who had suffered harm because of its prior criminalization of marihuana, without regard to their residence, either now or at the time of their offense or conviction. Indeed, New York went even further, securing leases for licensees and creating a

41

substantial fund to assist in operational costs in order to ensure that these individuals' businesses would succeed—steps not normally taken by the State to assist in private consumer ventures. *See* (JA 131-32); N.Y. State Fin. Law § 99-ii(3)(d).

And, under the *Pike* balancing test, the justice-involved requirement is constitutional because any incidental burden on interstate commerce does not clearly exceed local benefits. Indeed, it is not clear that there is *any* incidental burden on interstate commerce at all: an incidental burden on interstate commerce is a burden that "exceed[s] the burden on intrastate commerce," and thus, at a minimum, the challenged law "must impose a burden on interstate commerce that is qualitatively or quantitatively different from that imposed on intrastate commerce." *Town of Southold*, 477 F.3d at 50 (citations omitted). Here, the burden on a person who has not been convicted of a New York marihuana offense is the same whether the person resides in New York or out of state: namely, the person must go into business with an individual who has such a conviction in order to be eligible for a license. But even if some incidental burden on interstate commerce existed, it would be minor in

42

comparison to the local public benefit of addressing the severe collateral consequences of New York's prior marihuana laws and enforcement.

And even if the justice-involved requirement were discriminatory, it nevertheless is narrowly tailored to advance a legitimate local purpose and thus satisfies the dormant Commerce Clause. *Thomas*, 139 S. Ct. at 2461. The justice-involved requirement ensures that the profits from New York's new cannabis market flow primarily to the people who have suffered the effects of marihuana criminalization and continue to provide affected individuals an ongoing source of revenue that State financial assistance alone could not offer. The requirement also addresses the way in which New York marihuana convictions are continuous obstacles for affected individuals—potentially excluding them from career opportunities and federal assistance programs—by giving them a leg up in entering a new and growing market. And the requirement achieves these aims without excluding others from the cannabis market: individuals not convicted of a New York marihuana offense are welcome to partner with those who have such convictions, with New York's requirements set up to ensure that the justice-involved individuals maintain majority ownership and control of the business and are not used merely as fronts.

43

The justice-involved requirement thus satisfies the dormant Commerce Clause.

### 3. Address provision

The address provision found at 9 N.Y.C.R.R. § 116.4(a)(2)(ii) also satisfies the dormant Commerce Clause. On its face, the provision does not discriminate against out-of-state economic actors. Rather, it requires that *all* applicants, regardless of state of residence, provide evidence of the relevant individual's address at the time of their arrest or conviction for a New York marihuana offense.

Plaintiff alleges in its complaint that it believes that OCM will use evidence of the individual's address to "score an applicant higher if the individual's residence at the time of the individual's arrest or conviction was in New York." (JA 13-14.) But plaintiff provided *no* evidence or explanation of this concern sufficient to carry its burden of persuasion and warrant preliminarily enjoining this regulation. To the contrary, as the regulations themselves provide, the address provision was used *only* in a nondiscriminatory manner: to compare the average household income of the address's census tract to that of other tracts within the surrounding county or region, in order to determine whether the

44

individual lived in an area with a historically low median income. 9 N.Y.C.R.R. § 116.4(c)(2)(ii).

And defendants provided undisputed evidence to the district court confirming that OCM was only using convicted individuals' addresses in this nondiscriminatory way. (JA 141, 380-82, 449-52.) Indeed, because OCM's methodology compares the median household income of an individual's census tract only to the median household income of the census tracts in the surrounding county or region, the address provision cannot be said to discriminate based on state of residency, because all applicants who live in low-income census tracts relative to the surrounding area will be treated the same regardless of the state in which they are located. (*See* JA 137-39, 450-52.)

The address provision neither discriminates against out-of-state economic actors nor places a burden on interstate commerce, and thus satisfies the dormant Commerce Clause.

## POINT II

**PLAINTIFF FAILED TO ESTABLISH THAT IT WOULD SUFFER IRREPARABLE INJURY ABSENT A STAY**

Plaintiff did not carry its burden to demonstrate that it was likely to suffer irreparable injury absent a preliminary injunction, and the district court therefore erred in granting an injunction. As defendants' undisputed evidence demonstrates, plaintiff will not receive a license even absent the challenged provisions because it scored too low on OCM's rubric for evaluating licensees. (JA 379-82, 386-87.) Put another way, the district court's conclusion that a preliminary injunction was needed to protect plaintiff from being unconstitutionally excluded from or delayed in entering New York's cannabis market (*see* SA 25-26) was wrong: plaintiff will be excluded from the cannabis market—at least with respect to the present round of CAURD licenses—for legitimate reasons separate from the challenged provisions.

As a result, plaintiff cannot demonstrate that it would suffer *any* irreparable injury that a preliminary injunction could prevent, much less that such injury is *likely*. This fact is itself sufficient to reverse the district court's grant of a preliminary injunction. *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) ("[I]rreparable harm must

46

be shown to be actual and imminent, not remote or speculative."). The district court did not address the relative likelihood of plaintiff's irreparable injury.

The district court also erred in concluding that plaintiff had demonstrated a per se irreparable harm by alleging constitutional violations. (SA 25.) First, this analysis is inapplicable to violations of the dormant Commerce Clause. The dormant Commerce Clause seeks only to ensure an efficient national marketplace, *see supra* p. 28, and thus violations of the dormant Commerce Clause are unlike violations of an individual's personal rights under the First or Fourteenth Amendment that have been held irreparable harms. Second, as discussed, *see supra* pp. 33-45, plaintiff did not demonstrate to the district court that it is *likely* to succeed on its claims that New York's requirements violate the dormant Commerce Clause. And plaintiff cannot otherwise demonstrate irreparable injury solely by alleging a constitutional violation.

Plaintiff thus failed to carry its burden to demonstrate likely irreparable harm absent a preliminary injunction, and the district court's order must be reversed.

# POINT III

## THE DISTRICT COURT ERRED IN APPLYING THE REMAINING PRELIMINARY INJUNCTION FACTORS

The district court likewise erred in concluding that the balance of equities and public interest favored plaintiff.[8] In particular, the district court dismissed with little explanation defendants' multitude of evidence demonstrating the tangible and imminent harm to the cannabis industry, the public, and the State if OCM were enjoined from issuing dispensary licenses.

First, the district court ignored injuries to the 54 businesses in the enjoined regions that would receive CAURD dispensary licenses absent the preliminary injunction. Of the 150 currently available CAURD licenses, 54 were allocated to the enjoined regions, and 20 businesses within those regions had been notified that they were expected to receive licenses before the district court enjoined OCM. As a result, 54 applicants have been denied the ability to open their businesses, hire employees, and sell cannabis products. (JA 377, 453.) This problem is all the more

-----

[8] "When the government is a party to the suit, [a court's] inquiries into the public interest and the balance of the equities merge." *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021).

48

acute because owners of these businesses are individuals with criminal convictions for marihuana, which hinders their ability to find alternative employment or business opportunities. And *all* applicants within the enjoined regions remain indefinitely in limbo—not knowing whether they will ultimately receive a license or when they would be able to set up their business, thus having no reliable way to make decisions about their professional futures. Indeed, the entire purpose of New York's licensing scheme is to make up for the harm justice-involved individuals suffered under the State's prior criminalization of marihuana. Yet the State is prevented from doing exactly that as a result of the preliminary injunction.

Second, the district court did not credit defendants' extensive evidence about the injury that an injunction would cause to cannabis growers and processors within New York. OCM has licensed 262 businesses—primarily small family farms—to grow cannabis in New York, along with 25 manufacturers to process marihuana crops into commercial products.[9] (JA 377-78.) Enjoining OCM from licensing

---

[9] OCM advises that the current numbers have risen to 279 licensed growers and 40 licensed manufacturers.

49

dispensaries in five regions significantly reduces the market for these goods, risking growers' and processors' financial solvency. (JA 377-78, 448-49.) Given that cannabis production was expected to be a $1.5 billion industry in 2022 (JA 448), the loss of over one-third of the sales market creates a profound economic loss. In particular, the 121 growers and 16 manufacturers located in the five regions enjoined from licensing dispensaries must expend significant additional resources to sell and transport goods to dispensaries in the active geographical regions. (JA 377-78, 448-49.) To reach these regions, these local farms are required to build their own distribution networks with limited available capital. (JA 448-49.) The risk to the viability of these businesses and their ability to grow and process cannabis not only harms them, but also distorts New York's cannabis market itself. (*See* JA 377-78, 448-49.)

Third, the district court did not acknowledge the injury to New York residents caused by a preliminary injunction. People who live in the five enjoined regions are unable to purchase cannabis at a legal dispensary in their area, forcing them to either expend additional time and money to travel to a dispensary in a non-enjoined region or turn to illicit sources— including a significant number of unlicensed, illegal cannabis dispen-

saries in the State that OCM is working to eliminate (*see* JA 342-44)—to procure cannabis products. Individuals who purchase illegal cannabis risk purchasing and using unsafe products, as well as exposure to the criminal legal system despite the State's legalization of cannabis. (*See* JA 379.)

Finally, the district court ignored the harm to the State that a preliminary injunction would cause. The loss of sales at 54 dispensaries reduces the tax revenue to the State. (JA 378-79.) And the extensive time and effort spent negotiating and leasing storefronts for dispensaries in the enjoined regions will go to waste if businesses are not able to move into those storefronts, and the State will lose rental income while those storefronts sit empty. (JA 456-57.)

The district court nevertheless concluded that the balance of hardships tipped in plaintiff's favor because OCM would not begin issuing licenses until November 21, 2022, and the injunction would apply only in five geographical regions of the State. (SA 27-28.) But neither fact undermines defendants' evidence of the tremendous harm being done in those five regions, with effects radiating throughout the State, and that such harm continues now months after licenses would have been

awarded. The district court also concluded that the public interest tipped in plaintiff's favor because it is always in the public interest to enjoin an unconstitutional policy. (SA 28.) But this general legal principle cannot apply here because plaintiff has not demonstrated that OCM's requirements are unconstitutional. Moreover, plaintiff's weak showing on the merits is simply insufficient to outweigh the ample evidence defendants produced about the tangible harms that putative licensees, cannabis producers and processors, cannabis consumers, and the State would suffer if OCM's licensing program was enjoined.

## POINT IV

### AT A MINIMUM THE PRELIMINARY INJUNCTION SHOULD BE NARROWED TO ONLY THE FINGER LAKES REGION

This Court has the discretion to "narrow the scope" of a preliminary injunction pending an appeal, based on "the relative harms to [the parties], as well as the interests of the public at large." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087-88 (2017) (citation omitted). That is because "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Kane v. De Blasio*, 19 F.4th 152, 173 (2d Cir. 2021)

52

(quoting *Madsen v. Women's Health Ctr.*, 512 U.S. 753, 765 (1994)). In this case, even if this Court declines to reverse the district court's preliminary injunction in its entirety, the Court should nevertheless narrow the injunctive relief to only enjoin OCM from issuing licenses in the Finger Lakes, which is the only region in which plaintiff will be considered for a license.

The current preliminary injunction reaches "much further" than necessary to protect the plaintiff, and thus warrants narrowing. *Trump*, 137 S. Ct. at 2088. The district court initially enjoined OCM from awarding licenses to dispensaries in plaintiff's five preferred regions—Finger Lakes, Central New York, Western New York, Mid-Hudson, and Brooklyn. (SA 29.) But following the district court's preliminary injunction decision, OCM determined that there were a sufficient number of applicants for each geographical region, meaning that each applicant will *only* be considered for its top-choice region. (JA 375-76.) Plaintiff would thus only be considered for a license in the Finger Lakes region, and there is no basis to enjoin the distribution of licenses in the remaining regions, particularly in light of the ongoing harm a preliminary injunction will cause in the other four enjoined regions. *See supra* pp. 48-52. Indeed,

"[t]he equities relied on by the lower court[] do not balance the same way" in the remaining four regions, *see Trump*, 137 S. Ct. at 2088, in which plaintiff will suffer no harm absent a preliminary injunction but other putative licensees, cannabis producers and processors, the public, and the State will be injured by the injunction.

Because this Court has independent authority to narrow the scope of the preliminary injunction, defendants need not demonstrate that the district court's decision declining to narrow the injunction was erroneous. Nevertheless, the district court's decision was in error. The district court denied defendants' motion to narrow the preliminary injunction, concluding that defendants should have known at the time of the preliminary injunction that there were sufficient applicants for each geographic region. (SA 45-46.) But this reasoning ignores the practical reality that OCM was required to manually review over 900 applications, request missing or additional information from applicants to properly review their paperwork, and assess whether the applicants were qualified before knowing that there were sufficient legitimate applicants for each region. (JA 447.) This process took time and could not be

completed prior to briefing on plaintiff's motion for a preliminary injunction.

Moreover, the district court largely ignored the manifest injustice that would occur absent a narrowing of the injunction. In denying the requested modification, the district court cited only its previous reasoning about the balance of equities and public interest. (SA 46.) But the district court ignored that its reasoning did not apply the same way in regions in which plaintiff would admittedly suffer *no* harm absent an injunction, and thus even a risk of injury to third parties or the State would tip the balance of equities in defendants' favor. *See Trump*, 137 S. Ct. at 2088. And defendants demonstrated that there was much more than a mere risk of harm to participants in New York's cannabis industry, consumers of cannabis products, and the State. *See supra* pp. 48-52. The decision to continue enjoining licenses in four regions, which does not protect plaintiff and causes extensive harm to others, thus constitutes manifest injustice. The district court's contrary conclusion warrants reversal and a narrowing of its preliminary injunction.

## CONCLUSION

The Court should reverse the district court's order granting a preliminary injunction; in the alternative, the Court should narrow the preliminary injunction as requested.

Dated:  Albany, New York
        March 23, 2023

                              Respectfully submitted,

                              LETITIA JAMES
                                *Attorney General*
                                *State of New York*
                              Attorney for Defendants-Appellants


                        By:  _/s/ Alexandria Twinem_
                              ALEXANDRIA TWINEM
                              Assistant Solicitor General

BARBARA D. UNDERWOOD          The Capitol
  *Solicitor General*         Albany, New York 12224
JEFFREY W. LANG               (518) 776-2042
  *Deputy Solicitor General*
ALEXANDRIA TWINEM
  *Assistant Solicitor General*
      *of Counsel*

56

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Alexandria Twinem, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 10,515 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7).


_/s/ Alexandria Twinem_